Filed 4/22/15  Peterson v. Bonner CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JAMES A. PETERSON et al.,<br><br>     Cross-complainants and Respondents,<br><br>v.<br><br>ERNEST LINCOLN BONNER, JR.,<br><br>     Cross-defendant and Appellant. | A139033<br><br>(Contra Costa County<br>Super. Ct. No. MSC0700904) |
| KGMW, LP,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>ERNEST LINCOLN BONNER, JR.,<br><br>     Defendant and Appellant. | A140846<br><br>(Contra Costa County<br>Super. Ct. No. MSC0700904) |

Ernest Lincoln Bonner, appearing in propria persona, appeals judgments entered in favor of James A. Peterson, doing business as J&E Investments (J&E) and KGMW, LP, on their causes of action for damages, and in favor of Placer Title Company and its employee, Terese Johnson, (collectively Placer) on Bonner's cross-complaint for breach of fiduciary duty. The claims at issue all arise out of Bonner's efforts to obtain financing for the purchase of property in Lafayette, which was one part of what the trial court described as a "massive" real estate fraud engineered by one Derek Wheat. Bonner asserts that he was an innocent victim of Wheat's fraud, but the record amply supports the trial court's finding that Bonner was aware of some, if not all, of Wheat's fraudulent

1

activity and knowingly attempted to take advantage of his fraudulent scheme. Accordingly, we shall affirm.

## Factual and Procedural History[1]

In 2004, Wheat and Edward Cunningham agreed to work together to "flip" — i.e., buy, improve, and resell — houses. The first property they purchased was located on Estates Drive in Lafayette, California. The property consisted of two parcels with the same street address: parcel 6, on which they planned to build a new residence, and parcel 7, which was a vacant and unbuildable lot.[2] It is unclear from the record whether the property was already subdivided or whether the subdivision occurred at the time of the purchase. In any event, Cunningham purchased parcel 6 for $1 and separately purchased parcel 7 for $2,250,000. Cunningham obtained a $999,999 loan from Countrywide Loans Inc. (the Countrywide loan) that was secured by a deed of trust on parcel 7. Johnson of Placer Title Company served as the escrow agent for Cunningham's purchase of parcel 7. Johnson recorded a grant deed to Cunningham on parcel 6 as an accommodation to Cunningham, but not as part of the escrow. Title to both parcels was placed in Cunningham's name only.

In November 2005, Cunningham secured a $638,250 construction loan from CityFed Capital Inc. (CityFed) for construction of improvements on parcel 6.[3] The promissory note on the loan was transferred by CityFed to J&E and a deed of trust to secure repayment of the promissory note was recorded against parcel 6.

---

[1] The action below involved numerous parties and was tried in phases. Some claims were tried before a jury and others before the court. We have narrowed the summary of the facts to those that bear directly on the issues on appeal.

[2] Our references to the "property" or "Estates Drive property" are intended to include both parcels.

[3] CityFed is a licensed real estate brokerage firm. Both Cunningham and Bonner testified they believed CityFed was Wheat's company or that Wheat had a controlling interest in CityFed.

The relationship between Cunningham and Wheat subsequently broke down and Wheat then suggested to Bonner that he purchase the Estates Drive property.[4] Bonner had known Wheat for more than 10 years and Wheat was, at some point, the chief financial officer of Bonner's biotech company, FICARR, Inc. Bonner agreed to purchase the property for $2.5 million.[5] With assistance by Wheat and others, Bonner obtained a $2.4 million loan from Equity Funding Group, LP and EFG Mortgage Acq., LLC (collectively EFG) for the purchase of the property. Plaintiff KGMW, LP is the successor in interest to EFG.

An escrow account at Placer Title Company was used for the transaction, with Johnson serving as the escrow agent. On October 23, 2006, Bonner signed the preliminary title report prepared by Placer. The report identifies the property by address, but the legal description of the property describes only parcel 6, not including parcel 7. The preliminary title report indentifies, among other encumbrances, J&E's deed of trust securing payment of the $638,250 construction loan. On October 24, Bonner signed a document entitled "Assumption Agreement with Release of Liability" (the assumption agreement) which provides that "[a]s part of the purchase price of the above-described property" Bonner assumes Cunningham's liability under the promissory note secured by J&E's deed of trust.

Within minutes of signing the assumption agreement, after reviewing additional documents calling for his signature, Bonner stopped the escrow proceedings because he

---

[4] Bonner testified at trial that he did not learn until much later that the property was actually two separate parcels. At their first meeting, Wheat told him that "there was a possibility of subdividing a piece of the property at the top end and putting another house there."

[5] The record includes a settlement statement from the U.S. Department of Housing and Urban Development that shows a contract sales price of $3.2 million and a California Residential Purchase Agreement and Joint Escrow Instructions, dated September 1, 2006, which lists the purchase price of the property at $4.3 million, both of which bear Bonner's signature. At trial, however, Bonner denied that he signed the purchase contract claiming that there was no written contract for the purchase and that he agreed to purchase the property for $2.5 million.

knew he "did not want that loan." He claimed that he had just discovered the J&E deed of trust and that he had not agreed to assume the additional $638,250 obligation as part of the purchase price of the property. He told the escrow agent that he was leaving and would not sign any additional documents relating to the transaction.

The following day, Bonner received a phone call from one Fidel Nwamu, who Bonner knew through a prior real estate transaction. Nwamu told Bonner that he had just recorded a deed of trust against the Estates Drive property based on a $500,000 loan that he had made to Bonner. Bonner told Nwamu he knew nothing about such a loan and that he had not even purchased the property yet. Nwamu faxed Bonner a copy of the deed of trust. The deed of trust was recorded against parcel 7 and, according to Bonner, contained his forged signature. That afternoon, Bonner sent a letter to Placer directing that the escrow not be closed and immediately contacted Wheat.

Wheat told Bonner that J&E was owned by Wheat's company, CityFed, which had originated the loan, and "that there was no real loan that existed or that I had an obligation to pay." Bonner also learned that the money from Nwamu had gone directly to Wheat. Wheat told him that because Bonner had not completed the purchase, Nwamu's loan was not valid. Wheat also told him that an application had been submitted to the city for subdivision of the property but that parcel 7, against which Nwamu's deed of trust was recorded, was not a legally recognized parcel.

Shortly after this conversation, Bonner and Wheat signed an agreement in which Wheat acknowledged having received $570,000 from Nwamu. Wheat agreed to repay that loan and relinquish all of his stock holdings in Bonner's company, FICAAR, Inc., in exchange for Bonner's purchase of both parcels 6 and 7. Bonner explained at trial that it was at this time that he first "began to have suspicions about Mr. Wheat" and that is why he had Wheat sign the "agreement wherein he relinquished all stock ownership in my company. . . . [T]he first order of business was to get him out of that."

Around the same time, Wheat told Bonner that he would need to submit a new loan application to the lender because "the lender had a problem with [him] refusing to go through with the escrow." At Wheat's request, Bonner signed two blank loan

4

applications. Bonner explained that he was relying on Wheat to obtain the financing needed to complete the purchase. It was his "perception at the time, that [Wheat] had some sort of controlling or ownership interest in a mortgage company that actually funded loans, and it was [his] perception at that time that the funding was actually coming through [Wheat]."

EFG received two uniform residential loan applications, dated October 23, 2006 and November 1, 2006, from Bonner that falsely represented that Bonner would make a cash deposit of $718,467 toward the purchase of the property and that Bonner's assets included over $1.1 million in stocks and bonds. Bonner does not dispute that he did not contribute any cash towards the purchase of the property and at trial acknowledged that he does not have the $1.1 million in assets listed on the application. Bonner claimed that all of the false information was filled in by Wheat after he had signed blank forms.

EFG also received, in support of Bonner's loan application, copies of bank statements showing $718,467 in cash, and securities account statements showing $1.1 million in assets. Bonner acknowledged the information contained in the documents was false but claimed that all of the supporting documentation was manufactured by Wheat without his knowledge. Bonner claimed that he filled out a different and accurate handwritten loan application and gave it to Wheat, but he did not keep a copy and none was presented at trial.

On October 30, Bonner advised Placer that he was retracting his prior instruction to terminate the escrow and that the title company should proceed with the close. On the same day, Bonner signed "Buyer's Instructions" which falsely stated that he had made a $200,000 cash down payment. The buyer's instructions acknowledge that the purchase was subject to a deed of trust in favor of J&E with an unpaid principal balance of $638,250. The estimated settlement statement, which Bonner acknowledges signing, showed a purchase price of $3.2 million.

On November 6, 2006, Placer recorded a grant deed transferring title of Parcel 6 to Bonner.

In February or March 2007, Bonner first learned of the Countrywide loan against parcel 7 and immediately notified Countrywide that he suspected fraud was involved in the transaction. He also made a report to the District Attorney's office.

In April 2007, EFG filed a complaint against Bonner alleging, among other things, causes of action for negligent and intentional misrepresentation. EFG claimed that Bonner made numerous false representations to obtain the $2.4 million loan and that but for the false representations, EFG would not have made the loan. EFG's complaint also alleged causes of action against Placer and J&E, as well as many additional defendants, none of which are at issue on appeal.

In October 2007, J&E filed a cross-complaint against Bonner alleging, among other things, claims to recover on the promissory note secured by the deed of trust on parcel 6.

In December 2007, Bonner filed a cross-complaint against Placer alleging, among other things, a cause of action for breach of fiduciary duty based on Johnson's failure to disclose, in connection with the recording of his 2006 purchase, the fraud allegedly committed by Wheat and others against Countrywide in connection with the purchase of the property by Cunningham in 2004.

Following a lengthy trial, the court rejected each of Bonner's claims and defenses, including his repeated assertion that he was merely an innocent victim of Wheat's fraudulent scheme, in the course of which Wheat fraudulently obtained some $7 million of loans from multiple lenders secured by the same property. In its decision, the court states, "The parties to this dispute agree about one thing. Cross-defendant Derek Wheat was involved in massive fraudulent activities that resulted in the real property originally known as 1140 Estates Drive, Lafayette, being financed by four different lending entities such that almost $7 million dollars was extracted from the lenders by various dishonesties. From the evidence heard by the court, . . . the court concludes that while each of these parties[6] may not have been aware of each and every aspect of every

---

[6] The parties include Bonner and two other defendants who were involved with Wheat.

dealing in which Wheat engaged, the circumstantial evidence clearly establishes that each of them, [including] Bonner . . . , was aware that dishonesties were taking place and that lenders were being cheated. . . . [¶] Each of these three parties had a strong motive to participate in Wheat's various dealings in whole or in part. The reason was simply the greed involved with seeing a possibility of making a large windfall profit by 'investing' with Wheat. [¶] Bonner saw the possibility of working with Wheat in ultimately completing construction for a relatively small amount and 'flipping' the Estates Drive property, with absolutely no cash outlay on his part. In order to do so he was willing to sign documents in blank that a person with his vast education and experience would never do, overlook clear indicators that things were 'wrong', and proceed forward in hopes that at the end of the day the property could be sold for what he believed would be its finished value, $5 million."

With respect to EFG's claims for negligent and intentional misrepresentation, the court rejected defendant's argument that he was not liable because he had not personally made the misrepresentations that were made by Wheat, who engineered the "massive fraud" without his knowledge. The court concluded that even assuming Bonner did not know about the transmission of false information to EFG, he was liable nonetheless because he and Wheat were engaged in a joint enterprise to purchase and "flip" the property for a profit.

The court also found in favor of Placer on Bonner's cross-complaint. The court explained that Bonner had not "established that Placer violated any duty which it had as the escrow holder in [the 2006] transaction" and that, in any event, "the totality of the evidence shows that Bonner was aware of numerous facts which put him on notice of wrongdoings of Wheat, and by his conduct he clearly was willing to take abnormal risks since he had no actual financial investment in the Estate Drive Property."

Finally, the court found in favor of J&E on its claim for payment of the promissory note. The court noted that Bonner admitted signing the assumption agreement and found that he understood the effect of the agreement. The court rejected Bonner's claims that the agreement was procured by fraud.

7

On June 21, 2013, Bonner filed a notice of appeal from the judgments entered in favor of J&E in the amount of $1,093,601.94[7] and in favor of Placer on Bonner's cross-complaint. On January 14, 2014, Bonner filed a notice of appeal from the judgment entered in favor of KGMW in the amount of $2,487,265.00.[8] On Bonner's motion, the appeals were consolidated for purposes of briefing, oral argument and decision.

**Discussion**

**1.**     *KGMW /EFG v. Bonner*

A cause of action for intentional misrepresentation requires: " ' "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." ' " (*Engalla v. Permanente Medical Group, Inc.,* (1997) 15 Cal.4th 951, 974.) The scienter element may be satisfied by showing "either that defendant had actual knowledge of the untruth of his statements, or that he lacked an honest belief in their truth, or that the statements were carelessly and recklessly made, in a manner not warranted by the information available to defendant." (*Yellow Creek Logging Corp. v. Dare* (1963) 216 Cal.App.2d 50, 57, 58; Civ. Code, § 1710, subd. (2).) If a defendant makes a false statement, honestly believing it to be true, but without reasonable ground for such belief, the defendant is liable for negligent misrepresentation. (*Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 407-408.)

As noted above, the trial court found that Bonner was liable for both negligent and intentional misrepresentation. The court observed that Bonner "cannot sign a document without reading it and then claim 'fraud in the execution' of the document" as a defense

---

[7] The court awarded J&E "$500,000 in principal, plus interest of $480,205.56, plus attorneys' fees in the amount of $174,516.50, plus costs of suit in the amount of $10,279.88 for a total judgment of $1,093,601.94." Bonner does not separately challenge the calculation of the award.

[8] The court awarded KGMW, LP. "$1,444,800.00 in compensatory damages plus punitive damages in the amount of $480,000.00, plus attorney fees in the amount of $562,465.00 for a total judgment of $2,487,265.00." Apart from his argument, discussed below, that substantial evidence fails to support the award of punitive damages, Bonner does not challenge the trial court's calculation of the award.

8

to EFG's claims and that "Bonner is bound by those false representations on a *respondeat superior* basis, whether Wheat is deemed a partner, joint venturer or a mere agent." Bonner contends that there is no substantial evidence to support the court's findings that Wheat was his agent or that he was anything other than a victim of Wheat's fraud. We disagree.

Civil Code section 2295 defines an agent as "one who represents another, called the principal, in dealings with third persons." "A principal who puts an agent in a position that enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud. The principal is liable although he is entirely innocent, although he has received no benefit from the transaction, and although the agent acts solely for his own purposes. Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that, from the point of view of the third persons, the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him [citations]. The law reasons that where one of two innocent parties must suffer, the loss should be accepted by the principal who is responsible for the selection of the agent and for the definition of his authority." (*Reusche v. California Pacific Title Ins. Co.* (1965) 231 Cal.App.2d 731, 736-737.) Moreover, a principal may be liable for acts of his agent if he ratifies the agents prior unauthorized acts. "Ratification is the subsequent adoption by one claiming the benefits of an act, which without authority, another has voluntarily done while ostensibly acting as the agent of him who affirms the act and who had the power to confer authority [citation]. A principal cannot split an agency transaction and accept the benefits thereof without the burdens." (*Id.* at p. 737.)

Here, Bonner acknowledged that Wheat arranged the purchase and that he was relying on Wheat to obtain the financing needed to complete the transaction. Bonner does not dispute that when he signed the blank loan applications, he was expecting Wheat to fill in the missing information and that he knew the applications would be given to the lender. By his own admission, when he signed the blank loan applications, Bonner already had suspicions about Wheat's honesty, having learned that Wheat forged

9

Bonner's name on Nwamu's deed of trust and received $500,000 from Nwamu based on the forged document. Despite these red flags, Bonner did not terminate the transaction. He instructed the title company to proceed with the close of escrow and he accepted the benefit of the loan facilitated by Wheat. Moreover, it appears that Bonner made use of Wheat's questionable conduct in negotiating the relinquishment of Wheat's interests in Bonner's company.

This evidence amply supports the conclusion that Wheat was acting as Bonner's agent for the purpose of securing financing for the purchase of the property and that Bonner knowingly authorized or at least ratified Wheat's fraudulent acts. This same evidence refutes Bonner's additional argument that there is no substantial evidence of his "personal culpability" sufficient to support the award of punitive damages. (*Hale v. Farmers Ins. Exch.* (1974) 42 Cal.App.3d 681, 691, overruled on other grounds in *Egan v. Mutual of Omaha Ins. Co*. (1979) 24 Cal.3d 809, 822, fn. 5 ["California follows the rule laid down in Restatement of Torts, section 909, which provides punitive damages can be properly awarded against a principal because of an act by an agent if, but only if '(a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act.' "]; see also Civ. Code, § 3294, subd. (b) [employer may be liable for punitive damages based upon the acts of employee if "the employer had advance knowledge of the unfitness of the employee and employed him or her with a conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct for which the damages are awarded or was personally guilty of oppression, fraud, or malice."].)

**2**. ***J&E v. Bonner***

Bonner contends the court erred in holding him liable to J&E for repayment of the $638,250 loan. He argues that no contract was ever formed between Bonner and J&E "as there was never any mutual assent" to his assumption of the loan. The record, however,

amply supports the court's finding that Bonner intended to sign the document assuming the loan.

Bonner does not dispute that he signed the assumption agreement or that he signed the buyer's instructions acknowledging that his purchase was subject to the deed of trust in favor of J&E securing the note with an unpaid principal balance of $638,250. He argues that the fact that he terminated the escrow when he learned of the assumption demonstrates the lack of mutual assent to the agreement. However, this argument is undermined by Bonner's admission that he went forward with the purchase after Wheat told him that J&E was owned by Wheat's company, CityFed, which had originated the loan, and "that there was no real loan that existed or that I had an obligation to pay." It is clear that Bonner knew the assumption was part of the transaction when he rescinded his objection and instructed the title company to proceed with the close of escrow.[9]

The fact that Bonner may have been misled by Wheat with regard to whether he would have to repay the loan does not excuse his obligation to EFG, the holder of the promissory note. As the trial court noted, "even to the extent that Bonner was in any manner misled in going into the transaction, the fraud if any was perpetrated, according to Bonner, by Derek Wheat who was, at the very least, Bonner's agent and more likely his joint venture partner. J&E cannot be charged with the wrong-doings of Bonner's partner or agent." Having found substantial evidence to support the court's finding that Wheat was acting as Bonner's agent, we find no error in the courts conclusion on this issue as well.

**3**.    *Bonner v. Placer*

Bonner contends the court erred in concluding that Placer had no duty to disclose to him information known to Placer agents about the 2004 escrow transaction involving

---

[9] Bonner also claims that he refused to sign the agreement between J&E and EFG subordinating J&E's deed of trust to EFG's deed of trust and that his signature on that agreement is a forgery. Bonner's signature on the subordination agreement, however, was not integral to his assumption of the J&E loan and his refusal to sign that document proves little with regard to his intent to assume the J&E loan.

11

parcel 7 through which Cunningham purchased the property. He argues, "The trial court acknowledged that the escrow officers who handled appellant's escrow in 2006 had knowledge of the fraudulent transfer of the property in the 2004 transaction and further acknowledged that the fraud involved an outside party, Derek Wheat, who was also involved in appellant's escrow in 2006.[10] Appellant was not a party to the 2004 transaction and the trial court held that the escrow holder was under no duty to disclose that prior fraud to appellant. Appellant, however, asserts that the escrow holder, Placer Title Company, had a fiduciary duty to disclose its knowledge of the prior fraud to Appellant because there was clear evidence of a fraudulent scheme in the 2004 transaction; the same parties and the same real property involved in the 2004 fraudulent scheme were also involved in appellant's 2006 transaction; and appellant was a principal in the 2006 transaction but not in the prior 2004 transaction . . . . The trial court's finding that the escrow holder was under no fiduciary duty to disclose to appellant the 2004 fraudulent transfer of the property was an abuse of discretion which is reversible error." We disagree.

While an escrow holder is an agent and fiduciary of the parties to the escrow, "[t]he agency created by the escrow is limited-limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow." (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co*. (2002) 27 Cal.4th 705, 711.) "In delimiting the scope of an escrow holder's fiduciary duties, . . . we start from the principle that '[a]n escrow holder must comply strictly with the instructions of the parties. [Citations.]' [Citation.] On the other hand, an escrow holder 'has no general duty to police the affairs of its depositors'; rather, an escrow holder's obligations are 'limited to faithful compliance with [the depositors'] instructions.' [Citation.] Absent clear evidence

---

[10] Contrary to Bonner's argument, the court did not find that Placer was aware in 2006 of any fraud involved in the 2004 transaction. Rather, the court noted that while the evidence presented "can certainly be construed as establishing a reasonable likelihood that two of the escrow agents at Placer Title were conspiring with Derek Wheat to defraud," there was no reason to make factual findings as to their conduct because "[i]t did not occur during the Equity Funding/Bonner escrow."

of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions." (*Ibid.*)

There is no dispute that Placer properly complied with the 2006 escrow instructions and there are no allegations of fraud by Placer with respect to the 2006 transaction. The 2004 escrow included only parcel 7. Despite any agreement Bonner may have had with Wheat to the contrary, parcel 6 was the only parcel conveyed in the 2006 escrow. Johnson testified that early in the 2006 transaction, she emailed the mortgage broker, who brokered the loan with EFG, asking for "confirmation . . . as to which parcels [Placer] is covering[,] . . . both parcels or just one" and the broker replied that the escrow was only for parcel 6 "per Derek Wheat." All of the escrow documents support this understanding. The preliminary title report refers only to parcel 6. The deeds of trust recorded for the EFG and J&E loans reference only parcel 6, and the grant deed signed by Bonner describes only parcel 6.

Although Bonner testified that he asked Johnson to research the title on both parcels after receiving Nwamu's phone call and learning about parcel 7, Johnson denied ever receiving such a request from Bonner and the request is not in writing. The court reasonably could have found that Bonner's testimony was not credible. In any event, even assuming Bonner made such a request, he did not pursue that request after speaking with Wheat and instead willingly completed the purchase. Thus, Placer had no occasion or obligation to provide Bonner any title information about parcel 7.

### Disposition

The judgments are affirmed. Respondents shall recover their costs on appeal.

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Jenkins, J.